UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

A.B. CERNELLE,

                          Plaintiff,                        Case Number 03-10291

v.                                                   Honorable David M. Lawson

GRAMINEX, L.L.C. and CYNTHIA MAY,

                          Defendants.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO ENFORCE
SETTLEMENT AGREEMENT AND FOR CONTEMPT, IMPOSING REMEDIES, AND
DENYING DEFENDANTS' MOTION TO MODIFY INJUNCTION**

This case began in 2003 when plaintiff A.B. Cernelle sued defendants Graminex, L.L.C. and its chief operator Cynthia May over the ownership and operation of, and right to the use of trademarks associated with, Cernelle. Cernelle is a company that maintains its principal place of business in Sweden and for over fifty years has produced dietary supplements called nutraceutical products, which are intended to promote prostate health. The Food and Drug Administration (FDA) had verified Cernelle's claims made in connection with its products — the main ingredient of which is flower pollen — and Cernelle obtained approval for its products in Europe. At the time, Cernelle maintained specialized laboratories to produce its products and generated annual global sales of approximately $6 million.

At one time, Graminex was a source of raw, threshed flower pollen for Cernelle and distributed Cernelle's products in the United States. Cernelle, however, eventually accused Graminex and May of attempting to appropriate its trademarks, including CERNITIN and CERNILTON, prompting the lawsuit. The Court held evidentiary hearings and issued a preliminary injunction that prohibited the defendants from alienating those trademarks, among others, and dealing in products using those marks. The parties eventually reached a settlement,

the terms of which confirmed the plaintiff's ownership of the marks and prohibited the defendants from using them. The settlement order included a permanent injunction that, for the most part, tracked the preliminary injunction.

Plaintiff A.B. Cernelle now has filed a motion to enforce the settlement agreement and hold the defendants in contempt for violating certain terms of the permanent injunction. It contends that the defendants breached the settlement agreement and violated the injunction in three ways: (1) forging partnerships with foreign entities (which includes conspiring with Russians) that involve supplying the defendants' pollen product under the CERNILTON brand; (2) hosting a foreign entity's website that promotes flower pollen extract treatment for prostate cancer branded as "Cernilton"; and (3) citing clinical studies on the defendants' website, which report on the efficacy of the plaintiff's CERNILTON and CERNITIN products, in support of the defendants' own products.

The defendants insist that they have not violated the settlement agreement or injunction when they sold their products overseas using Cernelle's marks because they simply were complying with their customers' import requirements. But even if they did commit a violation, they contend, the Court has no jurisdiction to enforce the settlement agreement because jurisdiction was not retained and there is no independent basis for subject matter jurisdiction. And they argue that the Court should not invoke its inherent power to enforce its injunction because the plaintiff's delay in coming back to court subjects them to the defense of laches. The defendants also move to modify the injunction to limit its effect.

The Court held an evidentiary hearing on the plaintiff's motion at which eight witnesses testified and 102 exhibits were received. The law and evidence confirm that the Court has subject matter jurisdiction to enforce the settlement agreement. And the evidence clearly establishes the

defendants' willful violation of the settlement agreement and the injunction by selling products to foreign customers identified as the CERNILTON and CERNITON brands, and by maintaining a website with published studies extolling the benefits of CERNILTON and CERNITON embossed with Graminex's beaker logo. Cernelle's motion, therefore, will be granted. The defendants must remove the offending studies from Graminex's website and disgorge certain profits it received from the sale of the offending products. The Court will issue additional remedial injunctive relief. There is no basis to modify the injunction, which was entered as part of the settlement agreement, so that motion will be denied.

## I. Hearing Evidence

The original litigation culminated in a settlement agreement, which the Court approved in an order entered on September 29, 2006 that also included a permanent injunction. The injunction states:

> [I]t is **ORDERED** that the defendants Graminex, L.L.C. and Cynthia May, and each of them, their agents, servants, and employees, and all persons in active concert with them, are **RESTRAINED AND ENJOINED** from pledging or alienating the trademarks in dispute, including the following registered trademarks and trademark applications: CERNITIN®, No. 2,529,008 (registered January 15, 2002); CERNILTON®, No. 3,038,705 (registered January 10, 2006); CERNI-QUEEN®, No. 2,447,819 (registered May 1, 2001); POLLISPORT®, No. 2,519,274 (registered December 18, 2001); POLLEN STARK®, No. 2,519,275 (registered December 18, 2001); POLITABS SPORT®, No. 2,495,583 (registered October 9, 2001); and 75/857,801; and 76/012,676. This injunction is intended to prevent the negotiation and execution of contracts, agreements, options to purchase, deeds, memoranda of agreements, assignments, licenses, and plans that employ or relate in any manner to the registered trademarks and trademark applications, except as required by the parties' settlement of this litigation.
>
> It is further **ORDERED** that the defendants Graminex, L.L.C. and Cynthia May, and each of them, their agents, servants, and employees, and all persons in active concert with them, are **RESTRAINED AND ENJOINED** from marketing product manufactured by A.B. Cernelle under labeling that suggests it is not manufactured by A.B. Cernelle or represents that Graminex plays any role in producing the product except furnishing raw materials and acting as a

distributor.

It is further **ORDERED** that the defendants Graminex, L.L.C. and Cynthia May, and each of them, the defendants, their agents, servants, and employees, and all persons in active concert with them, are **RESTRAINED AND ENJOINED** from maintaining any website that is misleading as to its relationship with the plaintiff or that mentions the products CERNI-QUEEN®, CERNILTON®, POLLISPORT®, POLLEN STARK®, CERVITAL ™, NAPOLEN GOLD ™, CERNELLE®, and CERNITIN® in any way that suggests that Graminex is involved in the manufacture, development, or ownership of the products; and selling, promoting, or advertising products manufactured by A.B. Cernelle.
. . .

It is further **ORDERED** that this Court shall retain jurisdiction to enforce the terms of the injunctions set forth herein.

It is further **ORDERED** that either party may move to reopen these matters for the purpose of enforcing the settlement agreement on or before March 30, 2007.

ECF No. 85, PageID.2036-2037.

The plaintiff called witnesses at the hearing to describe Cernelle's worldwide activity since the settlement agreement was made and its discovery of the defendants' violations. The defendants also called witnesses.

### A. Goran Hellstrom

Goran Hellstrom testified that he has been the chairman of the board of A.B. Cernelle since 2005. He is a paid board member, attending five to six board meetings per year. He explained that the former managing director of Cernelle, Ferdinand Van Duijvenbode, retired in 2015 and passed away a year later. The managing director is the equivalent of the Chief Executive Officer. Ken Tinebo assumed his duties in August 2015.

Cernelle is a small company. It has 30 full-time employees. The CEO monitors intellectual property (IP) for the plaintiff; protecting the company's property rights around the world is one of his duties. The company is located in Hngeloholn, Sweden, and has no other offices. Hellstrom had learned of this lawsuit when he came onboard. He said it was important for Cernelle's future

because it encompassed all of its trademarks that were used throughout the world. In fact, he asserted that the trademark rights were the plaintiff's most important assets. Nonetheless, he acknowledged that the 2017 financial report for Cernelle (exhibit 249) does not contain any separate line item valuing the intellectual property (IP) as an asset of the company. Hellstrom trusted the CEO to work with an outside company, Zacco, to monitor IP use.

Hellstrom maintained that he did not know the full story of Cernelle's historic global activities. He said that he was not aware that at one time Cernelle products had been sold in Thailand or Russia. He was shown a distribution agreement (exhibit 144) dated August 1, 2002, but he said that it was not in effect with Thailand when he became the board chair.

Cernelle's financial troubles predated Hellstrom's involvement with the company. He was aware that sometime in 2002, Cynthia May separated from Cernelle, and a dispute soon followed. He first met Cynthia May with attorneys at a social dinner in Chicago sometime in February 2006 during the settlement negotiations. The objective was to obtain a clean and final divorce from Graminex and to secure Cernelle's trademarks for the company. In exchange, Cernelle gave up the inventory of 30 million CERNILTON tablets, a $1.6 million loan repayment, and the cost of the suit. At the time of the settlement negotiations, the defendants never told them that they were pursuing an arrangement to sell the plaintiff's products in Russia. Hellstrom identified the settlement agreement (exhibit 3) and explained that it was intended to cover all jurisdictions in which Graminex assigned Cernelle's trademarks. However, Hellstrom said that he took no direct steps to see that the defendant was complying with the agreement or with the injunction.

After signing the settlement agreement, Hellstrom relied on the fact that it was intended to solve the problems with the trademarks. But Cernelle was bankrupt at the time and had other priorities to address than the company's intellectual property.

Nonetheless, indications that Graminex may have been infringing the marks started to pop up. Hellstrom identified a watch notice dated February 2008 (exhibit 206) suggesting that Graminex Pharma was using the CERNILTON mark in Russia. He recalled that in 2009, there was a board meeting in which there were discussions about trademark use by others. He was worried that there was a connection between Graminex LLC and Graminex Pharma because of the common name. But he did not have evidence of a connection before 2013.

Hellstrom identified a printout of Graminex's website and noticed that it referenced clinical trials with the plaintiff's name in the studies. That came to light about ten years ago, he said. And he thought it was a violation of the settlement agreement. The Board directed the former CEO to research this issue and address it.

CEO Tinebo first reported to the Board about Graminex's noncompliance in April 2017. The Board instructed him to investigate, because it believed that it had the financial muscle by then to begin the process of enforcing its rights. It then filed the contempt motion in August 2018.

Hellstrom maintained that he was not aware before April 2017 that Graminex was not complying with the permanent injunction. He never knew that the CERNILTON mark was registered in the Russian federation to another entity. Cernelle had no offices or employees in Russia or Thailand. He acknowledged that the defendant's web page caused concern over the years about the defendant complying with the injunction.

Hellstrom insisted that the former CEO did not tell him before 2015 that an entity had registered CERNILTON in Russia. Instead, board minutes dated October 2013 (exhibit 147) reflected a report by the former CEO that problems with the website were now gone. There was a report that no other IP rights were outside of the company's control. And he was not sure if Graminex LLC was involved.

Hellstrom has no proof that Graminex owns Graminex Pharma, or that Graminex registered CERNILTON in Russia. Referencing the settlement agreement, he did not know what Graminex did with the 30 million pills.

At the present time, Cernelle does not sell products in Russia, Thailand, or Australia. Nor does Cernelle direct-market products in the United States. But, he asserted, the company's branding is an important part of its future. Hellstrom pointed to a business plan (exhibit 250), which indicated that the company's long-term intention is to register CERNILTOL in the U.S., E.U., Australia, and Russia by the fourth quarter of 2023.

### B. Ken Tinebo

Ken Tinebo has been the chief executive officer of A.B. Cernelle since August 2015. He explained that at one time, Cernelle was selling nutraceutical products. However, he closed down that division to build the company to be a pure pharmaceutical company. The difference between pharmaceutical products and nutraceutical products primarily involves authorizations to sell. Cernelle sold products in Japan, Korea, Taiwan, Sweden, and some E.U. countries. The plaintiff's business is now in pharmaceuticals in many countries for treating benign prostate hypertrophy (BPH) and other prostate diseases. The plaintiff markets CERNILTON, CERNITIN and CERNITOL.

Tinebo began focusing on Cernelle's trademarks sometime in 2016 when he received a list from its contractor Zacco about marks that would have to be renewed. He looked at the settlement agreement and permanent injunction briefly in the beginning of his tenure. Then, in April 2017, he turned to that issue in earnest.

Tinebo explained that the company had been in financial difficulties and there were a number of issues that needed to be addressed before turning to the intellectual property. Tinebo

searched the internet and informed the Board that Graminex Australia and Graminex Thailand were advertising products under the plaintiff's trademarks. Then he was distracted by life events (his daughter had a life-threatening condition), but he returned to the task and contacted the law firm. He reached out to Zacco after April 28, 2018 and got a report regarding the company's intellectual property. He obtained a second report, from the company's archives, where he learned that Graminex Pharma applied for the CERNILTON mark in Russia in 2007. No one pursued that with Graminex directly, however.

Tinebo had no contact with Graminex until after Cernelle contacted its law firm in this case. Then, demand letters were sent. He was shocked by the response, which was the defendants' total denial that they engaged in any improper activity. He believed they were lying when they said that they only produced their own product.

Cernelle purchased products from Graminex LLC, Graminex Australia, and Graminex Thailand and sent them to a lab for comparison. He received a report that they are very close in composition to Cernelle's product. Before this motion was filed, Tinebo saw no documentation that the defendant was filling orders for CERNILTON or CERNITIN in Thailand, Russia, or Australia. Cernelle has the trademark registration in Thailand and Australia. He explained that another company misusing Cernelle's marks wrongfully is "not ok." The marks have been around in the market for 60 years.

Tinebo said that the growth plan for the company was to be a leader in the pharmaceutical field for the treatment of benign prostate diseases. Specific countries are targeted, and he also wants the global coverage for his trademarks. He also wants to develop OTC (over the counter) products. But the company needs to do some more scientific work first. He has contacts in Russia, but the United States is a main focus because of the size of the market. He acknowledged that he

has no authorizations to sell in Russia. He has made no demands against Graminex Pharma over the use of the CERNILTON mark in Russia. But he says that Cernelle's competitive position is affected by Graminex LLC's use of the plaintiff's trademarks.

Tinebo acknowledged that Cernelle currently does not sell the product in Australia. Nor does the company have any current sales in the United States and no marketing authorizations to sell goods here. He has not taken steps to obtain authorizations in the United States. He cannot advertise products in the United States for sale to consumers under the law. He explained that Cernelle does sell to wholesalers in Sweden and they are only allowed to sell on the Swedish market. But he cannot control to whom they sell.

He insisted that he is still looking for distributors and soliciting partners to offer products for sale in the United States. He believes that the trademarks' value comes from the fact that they were around for decades and they are well-known to treat these prostate disease conditions.

## C. Cynthia May

Cynthia May was the CEO of Graminex when the settlement agreement was entered into in 2006. She maintained full responsibility for the company through 2011. A period of transition followed in which her daughter, Heather May, assumed her duties. May also managed Cernelle for its U.S. operations between 1999 and 2002. She acknowledged a letter that she wrote to Cernelle employees in December 2000 in which she identified the most important asset of A.B. Cernelle was its names and trademarks. (Exhibit 76: "These trademarks is [sic] what separated your product from every other flower pollen and also what was keeping our marking [sic] price a little higher.").

May was fired from Cernelle in April 2002. Graminex was bankrupt at the time but had raw flower pollen and started to develop its own product. It found contractors that could extract

their pollen in 2003. They wanted a process that did not use acetone because it created government regulatory problems.

Graminex, May explained, now markets flower pollen tablets under the name Pollen Aid. She insisted that the product differs remarkably from CERNILTON because Graminex does not use solvents to extract the pollen from the raw plant.

May acknowledged that Graminex sold its flower pollen products to similarly-named companies in Russia, Thailand, and Australia. It sold pollen extract pills to Graminex Pharma in Russia from February 2007 through October 2018, Graminex Australia from January 2007 through March 2015, and Graminex Thailand from June 2007 through September 2018. She insisted, however, that neither she nor Graminex U.S. had any ownership or agency relationship of any kind with those foreign entities. And she denied that the defendants promoted or facilitated the effort by Graminex Pharma to register the CERNILTON mark in Russia.

However, May admitted that she filled orders requesting CERNILTON with Graminex product. And the purchase orders and invoices for many of the transactions identified the pills sold to distributors in those countries as CERNILTON. For instance, the invoices for product sent to Graminex Pharma identified the product as CERNILTON and was packaged in bottles identifying the product as coming from "Graminex" and bearing the defendant's beaker logo. Invoices for product shipped to Australia and Thailand similarly identified the product as CERNILTON or CERNITIN.

May explained that the product specification sheet sent to the foreign importers was for Graminex's own formulation. And she says that she verbally told the customers that they were not actually receiving CERNILTON or any product manufactured by Cernelle. May said that Graminex issued invoices identifying the product as CERNILTON because its customers asked

for that designation to comply with import requirements. They wanted the shipments to reflect (falsely) that the pills were the same as the Cernelle-manufactured products for which market authorizations had been issued previously. May testified that she had no control over how those products were marketed in the importing countries after the shipments were received. However, she did acknowledge that as early as 2004 she was asked by Graminex Pharma to approve mockups for product packaging, and as recently as 2011 there was an exchange about altering the label on the product.

Graminex maintains a website; its web pages prominently display the company's beaker logo. May acknowledged that there are clinical studies on the Graminex website that refer to Cernelle products. They have been on that website since 2001, and she keeps them there for educational purposes. Not all of the studies relate to Cernelle products, and some relate to Graminex products. All of the studies, however, are embossed with the beaker logo.

### D. Heather May

Heather May is the current chief operating officer of defendant Graminex U.S. and incrementally succeeded to that position between 2007 and 2010. All employees except Cynthia May report to her.

Heather was able to furnish a bit more detail about the foreign transactions. She explained that the defendant's products shipped to Graminex Pharma were uncoated Pollen Aid tablets that were also sold to other countries, including Australia. Coated tablets were shipped to Thailand, but not to other countries. But Heather acknowledged that when shipping coated tablets (Pollen Aid) to Graminex Thailand, they were sold as CERNILTON or CENETIN. Those tablets were not sold to other customers.

Graminex U.S. has an ongoing relationship with Graminex Pharma. Graminex U.S. bottles and packages tablets shipped to Graminex Pharma. Heather May identified photographs of the shipping materials (exhibit 139). The bottle displays "Graminex LLC" and the beaker logo on the box on all sides. "Graminex Pharma" appears only on the back of the box. The bottle inserts and the English translation of the bottle labeling contain no reference to Graminex Pharma. The package inserts in English translations mention CERNILTON by name. An invoice from Graminex U.S. to Graminex Pharma (Exhibit 109) specifically referenced the sale of CERNILTON. Email correspondence between Amanda May (her cousin) and "Alla" in Russian (exhibit 106) placed orders for CERNILTON, but there was no reference on the email to Pollen Aid. Amanda May handled international accounts in 2012. Heather admitted that she used the CERNILTON name, but she says that she did so because she was told to do so by the importer. Heather acknowledged seeing the settlement agreement sometime in 2008 (it was signed in 2006), but she never asked for advice for what the company could do under the settlement agreement or the permanent injunction.

Counsel presented Heather with a copy of a licensing agreement between Graminex U.S. and Graminex Pharma (exhibit 142). She signed on behalf of Graminex U.S. She did not consult anyone regarding the impact of the settlement agreement or the permanent injunction before she signed. She did not even retain a copy of this document, and she says she does not recall signing it. A supplier contract (exhibit 143) between Graminex U.S. and Graminex Pharma mentions CERNILTON. She acknowledged signing that contract. She testified that she was told that she had to sign that contract so that Graminex Pharma could import the product. The value of the contract indicates product value of $5.7 million, but Heather said that the deal was not worth that much, and she was told that the figure was for import purposes.

Heather May identified a purchase order from Graminex Thailand to Graminex U.S. for "Cernilton" (exhibit 113). The code on the order, "B-16," is Graminex's code for Pollen Aid tablets. Heather was not aware of any marketing authorizations issued to Graminex LLC by the Kingdom of Thailand. She admitted that she listed the CERNILTON name on the pro forma invoice (exhibit 114).

Heather identified the Graminex website, which displayed a comparison study that was added in 2018, after the company received a letter from the plaintiff's attorney. She insisted that there is no benefit to Graminex for its products to be confused with Cernelle products. That could not be true, however, because the importers apparently would not accept Graminex's product unless it was identified as a Cernelle product.

In each instance of selling its product to importers in Russia, Thailand, and Australia, Heather noted, the specification sheets accompanying the shipments contained the product formula for Pollen Aid, not CERNILTON. Nonetheless, Graminex Australia's sales report from 2007 through 2015 (exhibit 224) references CERNILTON tablets.

Heather explained that Graminex purchased specialized equipment to fill orders for Graminex Pharma. The purchase extended over several years and consisted of tableting machines. She said if Cernelle had brought its motion earlier, Graminex might not have purchased some of that specialty equipment. She believed that the used equipment sells for under 30% of the acquisition price.

But Heather also acknowledged that the long-term supply "contracts" with Graminex Pharma are not real contracts. The amounts are highly overstated, and there is no assurance that other orders will be placed by Graminex Pharma, Graminex Australia, or Graminex Thailand. She bought all the specialized equipment anyway, apparently anticipating that sales would continue.

### E.  William Hartzer

The plaintiff called William Hartzer, a website designer, to explain why the defendant's product information is returned in prime positions when internet searches are conducted for the plaintiff or its products.  Hartzer specializes in websites and search engine optimization audits. The plaintiff theorized that Graminex configured its website by including references to studies of the plaintiff's products with the intention of misdirecting web searches for CERNILTON to itself. But Hartzer was not able to close that circle.

Most of Hartzer's work focuses on search engine optimization for his clients.  He gives advice to make keywords code-friendly and search-engine friendly, so the website is more relevant to a particular keyword.

His work in this case dealt with Google; he did not access any other search engines.  He said that Google has an algorithm that weighs several factors, including (1) the word in the title tags; (2) links, citations, and popular mentions; and (3) relationships between one website and another.  But he acknowledged that Google uses thousands of factors to determine ranking and that the same keywords can yield different results in different searches.  He did not know them all.

When Hartzer searched for CERNILTON, he was given hits for Graminex.com because there were studies on the defendant's website that were trusted studies.  That is significant, he believed, because Google looks at all the websites for that keyword.  Here, Graminex.com cites and copies articles relating to CERNILTON and CERNETIN.  There are other websites that cite the defendant's website and these articles.  Hartzer deemed it unusual for a competitor's product to appear when a company named is searched for.   He said one must go through another provider and links to prove to Google that one is related to another company.  He also says that geography can be a factor in content searches.

Hartzer believed that if the defendants removed articles referring to CERNILTON and CERNETIN, Google searches for those terms would not return the defendant's site. There are also negative keywords associated with Google search results, which are used to be sure that an ad does not show up when certain keywords are clicked on. But he could not point to any conduct by the defendants intended to cause confusion in the search results.

Hartzer acknowledged that his activities could help clients improve their own search results. For instance, he can optimize a client's webpage to help improve the priority of the organic search results on the search engine. But he cannot totally eliminate a connection to a competitor's products; he can only recommend activities to change the prominence or priority of the return.

### F. Leslie Verral

Leslie Verral, the defendants' web optimization expert, explained that clinical studies of Cernelle products appearing on the defendant's website is not the only reason there is an association between the plaintiff's and defendant's products. Other factors also play a role, such as lack of marketing on Cernelle's part, other studies dealing with flower pollen and prostate health, no H-1 tags on Cernelle's own website, the copy length issues on their pages, and lack of quality content.

She believed that related products tend to influence search results, because Google tries to "fill the void" with relevant information. She also believed that if the defendant removed the clinical studies, it would not necessarily change the search results.

### G. Economic Witnesses

Cernelle argues that because Graminex breached the settlement agreement and violated the permanent injunction, it should be required to disgorge the profits it earned on the sales of its own nutraceuticals that were facilitated through the use of Cernelle's trademarks. Both sides called

accountants to give opinions on the amount of profit earned. Both witnesses — Michael Chase for the plaintiff and Rodney Crawford for the defendants — agreed that the proper method for determining profit is to deduct costs from total sales revenue. And there was not much dispute in the calculation of total sales revenue on the accused products.

Their main dispute was in determining the net of cost of sales, which was complicated because Graminex did not track profits by product line, and it did not allocate costs to those products. Both worked from Graminex's profit and loss statement that reported income from 2007 through 2017 (exhibit 258).

Chase believed that the incremental-product approach was the more appropriate method for determining net costs. He used "simplifying assumptions" to determine a rough adjustment of each cost category. Initially, he did not include research and development costs, legal and professional costs, and freight, rent, and depreciation. Chase's goal was to isolate those costs that were product production-specific and specific to the accused products. The costs he eliminated, he said, had not much to do with product activity, and they were textbook examples of fixed costs. He wanted to deduct variable costs. After reading Crawford's report, he reconsidered a deduction for legal expenses, concluding that although the expenses related to this lawsuit had little to do with product activity, some routine legal expenses might be product-specific, and he allowed a 1% figure to be included in the costs deducted.

Chase did not believe that an interest expense for financing equipment purchases was an appropriate deduction. He reasoned that it was not an operating cost; it was an expense of financing the business. He explained that the company had virtually no debt in 2010, but the debt ballooned to about a quarter of a million dollars in 2016 and 2017. That, he said, was a conscious decision by the owners of the company to borrow rather than invest their own money, and therefore

it involved financing, not operations. He also noted that the defendants brought some manufacturing operations in house, where they previously had contracted it through outside vendors, and that also was a financing decision. On the other hand, he allowed full deductions for equipment leases. And he deducted depreciation of the equipment at a rate of about 40%, a figure he derived from Crawford's report.

Crawford disagreed with Chase's methodology, opining that the fully-costed approach was better suited to the circumstances. He applied that method by calculating total production costs for all products and then allocating the costs to the accused products on a pro-rata basis according to the percentage of accused sales versus total sales. His approach was more inclusive. For instance, he included all legal and professional expenses, except for the litigation expenses related to the present lawsuit. He included interest expenses, even though he acknowledged that it was a financing cost. And he deducted a share of the equipment (except general-purpose facilities and equipment) based on a seven-year depreciation schedule.

One point of contention focused on a machine that presses the powdered substances into tablets. Heather May testified that she purchased the tableting machine to produce Pollen Aid. Graminex's domestic sales of that product were relatively small, and the machine produced tablets primarily for the foreign market. Graminex sold other tablet products in the United States, but those pills were larger and could not be produced on the machine without retooling. Crawford believed, therefore, that he could justify deducting the cost of financing and depreciating that machine as an expense associated with the accused sales, noting that the salvage value of that equipment was low.

Chase disagreed. He acknowledged that if the new equipment were dedicated to a specific product line and unique to it, it's acquisition cost would be an expense that could be depreciated

and costed out.  However, he believed that the tableting machine could be dedicated to other purposes within the plant (which Heather May confirmed, albeit with some retooling) and it was worth much more than the salvage value, even if the product sales went to zero for that particular product line.

Chase broke down the profits Graminex made from its sales of product identified as CERNILTON to Russia, Thailand, and Australia.  Sales to Graminex Pharma (Russia) captured the highest percentage of the total sales of the accused products.   Between August 2012 and 2018, the total sales of the accused products were $3.3 million and sales to Graminex Pharma were $2.9 million.

Under the incremental profits approach, with a six-year lookback period (from the time the motion for contempt was filed through the end of 2018), Chase's profit calculations were $960,005 profit on $3.3 million in total sales of accused products.  His breakdown:

> Graminex Pharma: $833,000
> Graminex Thailand: $105,360
> Graminex Australia: $21,558

Using a three-year lookback period, he calculated $535,854 profit on $1,625,859 in total sales, broken down as follows:

> Graminex Pharma: $453,184
> Graminex Thailand: $82,670
> Graminex Australia: No Accused Sales

Chase then applied the fully-costed approach, applying an appropriate share of fixed costs and setting aside all the below-the-line expenses (financing, interest, dividends, etc.), other operating costs not related to the accused product production, and adjusting legal expenses.  Using the same sales figures, he calculated a total profit on accused sales looking back six years at $564,036 for the three countries as follows:

> Graminex Pharma: $491,515
> Graminex Thailand: $59, 831
> Graminex Australia: $12,690

Using a three-year lookback period for the fully costed approach, the total profit was $307,544 allocated as follows:

> Graminex Pharma: $260,927
> Graminex Thailand: $46,617
> Graminex Australia: No Accused Sales

Overall sales and the percentage of accused sales range from 2% to slightly over 20% between 2007 and 2014.

Crawford calculated considerably lower profits applying the fully-costed approach. Using a three-year lookback period, he believed that the total profit was $159,029 on gross sales of $1,624,859. He did not break down the profit among the three countries. Going back to 2007, he found that there was a profit of $711,411 on gross sales of $5,644,386.

Crawford also used his version of the incremental-cost approach, although he disagreed with Chase's elimination of certain items that he deemed fixed costs. One was an equipment lease expense, because apparently there were calculations going back to 2007 when the company had a lease on a tableting machine that was calculated at $84,000. He fully deducted it. He also deducted the capital expense on the tableting equipment in total. His rationale is that the equipment is fully dedicated to the use on accused products only. Under that approach for a three-year lookback period, he determined a total profit of $149,904. Going back to 2007, the profit was actually negative because the company did not recover all its capital expenditures through the sales.

## II. Settlement Agreement Enforcement

### A. Jurisdiction

In its motion, the plaintiff asks the Court both to find the defendants in contempt of the permanent injunction and to enforce the settlement agreement, rarely distinguishing between the two in its arguments. Although the injunction and the settlement agreement are intertwined, they are not the same. The defendants parse the two, emphasize the difference, and argue that the Court does not have subject matter jurisdiction to enforce the settlement agreement (although conceding jurisdiction to enforce the injunction). They have a point, but not a winning one.

The Sixth Circuit has explained that a district court possesses broad, inherent authority and equitable power to enforce the terms of a settlement agreement entered into by the parties to litigation. *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988) (quotations and citations omitted). In most cases, as here, the settlement results in the dismissal of a lawsuit. Thereafter, "[t]he court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement." *Ibid.*

However, "[e]nforcement of [a] settlement agreement . . . whether through award of damages or decree of specific performance, is more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 378 (1994). In *Re/Max International, Incorporated v. Realty One, Incorporated*, 271 F.3d 633 (6th Cir. 2001), the court of appeals held that *Kokkonen* authorizes a district court to enforce a settlement agreement if the dismissal order contains one of two provisions: incorporation of the settlement agreement in the dismissal order, or language retaining jurisdiction. 271 F.3d at 642. Otherwise, the Court must have an independent basis to exercise federal jurisdiction in a settlement-agreement-enforcement proceeding.

The dismissal order in this case was expressly entered "pursuant to [the] settlement agreement," but that is not enough. That phrase "fails to incorporate the terms of the settlement agreement into the order because a dismissal order's mere reference to the fact of settlement does not incorporate the settlement agreement in the dismissal order." *Ibid.* (citations and internal marks omitted). More so, "the mere reference in a dismissal order to a settlement agreement does not incorporate the settlement agreement into the order." *Ibid.*

The dismissal order does have retaining-jurisdiction language, but that provision sunsetted by its own terms on March 20, 2007. If the Court did not "retain jurisdiction" or the time for it has expired, "enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction." *Kokkonen*, 511 U.S. at 382; *see also Hehl v. City of Avon Lake*, 90 F. App'x 797, 802 (6th Cir. 2004) (rejecting the plaintiff's position that "the fact that the district court's order contained a thirty-day time limitation d[id] not necessarily preclude a finding of jurisdiction beyond the thirty days.").

A district court may enforce a settlement agreement that produced the dismissal of an earlier federal suit, even if it did not retain the authority to do so in a dismissal order, when the court has diversity or federal question jurisdiction over the breach-of-settlement-agreement controversy. *Limbright v. Hofmeister*, 566 F.3d 672, 676 (6th Cir. 2009) (holding "that *Kokkonen* and this court's case law allow an 'independent basis for federal jurisdiction,' such as diversity or federal question jurisdiction, to support summary enforcement"). In this case, there is no question that the citizenship of the parties is diverse. But to invoke diversity jurisdiction, the amount in controversy must "exceed[] the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a).

The defendants argue that the plaintiff has failed to establish that the Court has supplemental jurisdiction to enforce the settlement agreement because it failed to allege adequately that the amount in controversy exceeds $75,000. The plaintiff does not address that argument at length in its pre- or post-hearing briefs, other than to say simply that the jurisdictional threshold has been met. It also argues that the Court may exercise supplemental jurisdiction under 28 U.S.C. § 1367(a), using the injunction-enforcement authority as a hook. That argument is a non-starter. *See Perkins v. Booker*, No. 08-CV-97, 2011 WL 3664689, at *5 (W.D. Mich. Aug. 19, 2011) (noting that there is nothing in Sixth Circuit precedent interpreting and applying *Kokkonen* that allows the exercise of supplemental jurisdiction under section 1367 to enforce a settlement agreement in a closed case). The plaintiff must meet the amount-in-controversy threshold.

In actions seeking specific performance of a settlement agreement, "'it is well established that the amount in controversy is measured by the value of the object of the litigation.'" *Cleveland Hous. Renewal Project v. Deutsche Bank Trust Co.*, 621 F.3d 554, 560 (6th Cir. 2010) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)). "While absolute certainty is neither attainable nor required, the value of [equitable] relief must be 'sufficiently measurable and certain' to satisfy the amount-in-controversy requirement." *South Fla. Wellness, Inc. v. Allstate Ins. Co.*, 745 F.3d 1312, 1316 (11th Cir. 2014) (citation omitted); *see also Chrysler Grp. LLC v. South Holland Dodge, Inc.*, No. 10-12984, 2015 WL 4429456, at *5 (E.D. Mich. July 20, 2015) (finding that the Court lacked subject matter jurisdiction over the plaintiff's motion to enforce settlement agreement because "any benefit that would be obtained from the requested injunction [was] not sufficiently measurable to satisfy the amount in controversy requirement and [was] far too speculative to sustain diversity jurisdiction").

The defendants contend that if the Court were to find that the settlement agreement was breached, the requested injunction would preclude Graminex from honoring orders for CERNILTON and would require removal of the clinical trials from Graminex's website, actions that have no measurable value to the plaintiff. The hearing evidence established that the plaintiff conducts no sales in the foreign jurisdictions at issue and has no sales or marketing presence in the United States. And the plaintiff cannot rely on "goodwill" to establish value because it has not shown any loss of goodwill, and it did not put forth any evidence to establish its value.

But the settlement agreement also includes a permanent injunction, which the plaintiff endeavors to enforce. And one way to measure "the value of the object of [this] litigation" is to assess "the monetary value of the benefit that would flow to the plaintiff if the [relief he is seeking] were granted." *South Fla. Wellness*, 745 F.3d at 1315-16. Alternatively, the Court may look to the "costs of complying with [the] injunction . . . [to] establish the amount-in-controversy." *Everett v. Verizon Wireless, Inc.,* 460 F.3d 818, 829 (6th Cir.2006). If the Court were to enforce the injunction and order Graminex to discontinue supplying product to Graminex Pharma identified as CERNILTON, market authorizations had been issued previously, its supply contract, which is valued (at least nominally) at $5.7 million, would be jeopardized.

Additionally, among the items in its request for relief, the plaintiff has asked the Court to order Graminex to disgorge the profits earned by conduct that violated the settlement agreement. "Disgorgement is an equitable remedy," *S.E.C. v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985), that forces "a defendant to give up the amount of money equal to the defendant's unjust enrichment." *Gavriles v. Verizon Wireless*, 194 F.Supp.2d 674, 681 (E.D. Mich. 2002). That remedy may be imposed for the intentional or reckless violation of a settlement agreement. *Kansas v. Nebraska*, 574 U.S. 445, 135 S. Ct. 1042, 1056 (2015); *see also* Restatement (Third) of Restitution and Unjust

Enrichment § 39 (2010) (Restatement). The reason is that "a party's profitable breach of contract may be a source of unjust enrichment at the expense of the other contracting party." *Id.* cmt. *a*.

Both Michael Chase and Rodney Crawford testified that Graminex earned profits well in excess of the $75,000 jurisdictional threshold from sales of its product to customers in Russia, Thailand, and Australia identifying it as CENELTON, which is conduct prohibited by both the settlement agreement and the permanent injunction incorporated within it. Because disgorgement is an available remedy for the breaches the plaintiff alleges, the amount the respective parties are fighting over includes the defendants, net profit earned from the accused sales, totaling as much as $960,005. Looking to that possible exposure, coupled with the defendants' supply contract with Graminex Pharma that could be in jeopardy, it is apparent that the plaintiff has put forth evidence that satisfies the amount-in-controversy requirement of 28 U.S.C. § 1332(a), and therefore, the Court has an independent basis to entertain the plaintiff's motion to enforce the settlement agreement.

### B. Breach

Although courts have broad authority to enforce settlement agreements, "[t]he court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement." *Brock*, 841 F.2d at 154. A settlement agreement in essence is a contract. When enforcing a contract, the first objective is to "honor the intent of the parties," *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 29 n.28 (1994), and the prime source of that intent is the plain language of the agreement, *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 61, 664 N.W.2d 776, 787 (2003) ("Well-settled principles of contract interpretation require one to first look to a contract's plain language.").

Aside from the terms of the injunction, Cernelle alleges that the defendants violated separate provisions of the settlement agreement that are plainly stated. In section A(1), the defendants agreed to "relinquish all claims of ownership" to Cernelle's registered trademarks, including CERNILTON and CERNITON. Section A(3) states: "Graminex, May and Baldauf shall nxot use Cernelle's trademarks and trade names." The evidence adduced at the hearing demonstrates that the defendants intentionally and willfully violated those provisions.

The settlement agreement plainly states the parties' intention to separate their business dealings, assign to each other their separate respective trademarks, and refrain from infringing on them or making a claim to them from that point forward. Graminex became the undisputed holder of the marks it used in Sweden (exhibit 3, Settlement Agreement § A(8)), and A.B. Cernelle became the undisputed holder of its several trademarks, which included CERNELLE, CERNITIN, and CERNILTON (*id.* § A(1)). And to drive home the point, the agreement said that the defendants "shall not use" those marks.

Both Cynthia and Heather May testified, however, that Graminex filled orders for CERNILTON, and in some cases CERNITIN, from customers in Russia, Thailand, and Australia. To be sure, they asserted that they filled those orders with Graminex's own product, and, at least in some instances, provided the customer with product information that described Graminex's formulation of the flower pollen tablets, which, they asserted, was different from and superior to the actual CERNILTON and CERNITON products. But they identified the product on packing and shipping documents as CERNILTON or CERNITIN, explaining that their customers wanted them to do that. One might ask why a vendor would want to misidentify its own product as one it deemed inferior. The plain answer is that the customers had authorizations from their domestic governments to import and sell Cernelle-branded products, but not the nutraceuticals manufactured

by Graminex. The only way the transactions could be completed was to identify the product as matching the marketing authorizations that had been obtained earlier for genuine Cernelle products. Put another way, to export its products to Russia, Thailand, and Australia, Graminex had to "*use* Cernelle's trademarks and trade names," conduct expressly prohibited by the settlement agreement.

Both Heather and Cynthia May asserted that Graminex had no control over how the product was packaged and marketed after it was shipped to the customer. But both were aware that their bulk pills sent to Graminex Pharma were packed in bottles that identified them as Cernelle product. There was no mention of Graminex Pharma on the packages, and the Mays were not even aware of any marketing authorizations issued in Russia or the other two countries for Graminex products.

By carrying on such a course of dealing with those customers in Russia (Graminex Pharma), Thailand (Graminex Thailand), and Australia (Graminex Australia), the defendants continuously, systematically, and intentionally violated the relevant terms of the settlement agreement.

Cernelle alleged in its motion that Graminex breached the settlement agreement by registering CERNILTON with the WIPO and in Russia, Kazakhstan, Belarus, Armenia, and Ukraine. There is no evidence in the record that supports that claim. The plaintiff also contends that the defendants forged actual partnerships with its foreign customers in Russia, Thailand, and Australia. And in the case of Graminex Pharma, the plaintiff accused the defendants of conspiring with the Russian entity to register CERNILTON in Russia as a trademark belonging to Graminex Pharma. That conduct would directly violate section A(2) of the agreement, which prevented the defendants "and any affiliated entity in which they have a direct or indirect ownership interest . . .

to register the Cernelle marks in the future . . . ."  The evidence does not support that accusation, either.

It is undisputed that Graminex Pharma registered the CERNILTON trademark in Russia. And it cannot be contested that Graminex U.S. worked together with Graminex Pharma to sell the defendant's products in Russia.  But the link between the Russian entity's registration and the defendant's role in that registration is missing.  Cernelle relies primarily on powers of attorney by which Graminex U.S. authorized Graminex Pharma "to represent [the defendant's] interests in state organizations responsible for registration and re-registration procedures" of its products in Russia (Exs. 78, 84).  It also points to an article in one of the defendant's publications, *The Pollen Press*, stating that Graminex Pharma is the defendant's "partner."  However, there is no proof that the defendants have "a direct or indirect ownership interest" in Graminex Pharma.  Nor is there any record evidence of the process by which CERNILTON was registered by Graminex Pharma as a trademark in Russia, and no direct evidence that the defendant played a role in that process.

Nonetheless, the plaintiff has established that the defendants breached sections A(1) and (3) of the settlement agreement.

### III.  Permanent Injunction

### A.  Motion to Modify the Injunction

After the proceedings were underway on the plaintiff's enforcement and contempt motion, the defendants moved the Court for a partial modification of the permanent injunction.  They believe that the plaintiff abandoned its rights in the CERNILTON and CERNITIN trademarks, amounting to a significant change in circumstances that eliminates the need for continuing protection under the permanent injunction.  The defendants asked that the Court remove the two trademarks from the mandatory language of the order.

Certainly, "[c]ourts have long held the power to modify injunctions, whether to narrow or broaden them." *LFP IP, LLC v. Hustler Cincinnati, Inc.*, 810 F.3d 424, 426 (6th Cir. 2016). That power flows from the nature of injunctive relief. "Injunctions frequently demand 'continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief.'" *Ibid.* (quoting *Sys. Fed'n No. 91, Ry. Employes' Dep't v. Wright*, 364 U.S. 642, 647 (1961)). "Courts thus may exercise their 'sound judicial discretion' to modify an injunction 'if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.'" *Ibid.* (quoting *Sys. Fed'n No. 91*, 364 U.S. at 647).

But the defendants seem to ignore the critical fact that the permanent injunction issued in this case was part of a settlement agreement, which bring with it several other, sometimes competing, considerations. "There is a deeply embedded judicial and legislative policy in favor of keeping final judgments final." *Cummings v. Greater Cleveland Reg. Transit Auth.*, 865 F.3d 844, 846 (6th Cir. 2017) (citations omitted). "That is especially true for settlement agreements." *Ibid.* "A settlor's remorse cannot alone justify abandoning such judgments." *Ibid.* "Else, the key virtue of settling cases — letting the parties move on after they each get some of what they want — would be lost." *Ibid.*

The permanent injunction was not the only feature of the settlement agreement. In addition to conveying all of Cernelle's trademarks to it and preventing the defendants from laying any claim to their use or ownership, the settlement agreement also

- Prohibited Cernelle from posting a link to Graminex's website
- Required Cernelle to assign its interests in Graminex's trademark registrations and logo in Sweden
- Required Cernelle to pay $1.6 million to a Swedish company controlled by May (Cernelle Holding A.B.) to satisfy a judgment in a Swedish court and retire a loan

- Required Cernelle Holding and Cernelle to dismiss separate lawsuits they had brought against each other in Sweden
- Contained extensive and detailed mutual releases.

The defendants want to change the injunction, but they have not discussed the impact that would have on the other integrated parts of the settlement agreement.

"Rule 60(b) offers an exception" to the principles of finality and integration of settlement agreements. *Cummings*, 865 F.3d at 846 (citing *GenCorp, Inc. v. Olin Corp.*, 477 F.3d 368, 372 (6th Cir. 2007)). It provides six discrete paths for undoing a final judgment or order, including "where 'applying [the order] prospectively is no longer equitable.'" *Ibid.* (quoting Fed. R. Civ. P. 60(b)(5)). "Injunctions (permanent or temporary), some declaratory judgments, and particularly consent decrees are prospective judgments susceptible to a Rule 60(b)(5) challenge." *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 355 F.3d 574, 587 (6th Cir. 2004) (citing 12 James Wm. Moore, Moore's Federal Practice §§ 60.47[1]-[2]). But "the party seeking relief . . . [must] show a significant change either in factual conditions or in law." *Cummings*, 865 F.3d at 847 (internal marks and citations omitted).

The parties must keep in mind that a request to modify a permanent injunction "does not mean that the parties may duel and re-duel over the merits of the original injunction . . . . It does mean, however, that the parties may receive modified relief when 'the original purposes of the injunction are not being fulfilled in any material respect.'" *Hustler Cincinnati, Inc.*, 810 F.3d at 426 (quoting 11A Charles Alan Wright et al., Federal Practice & Procedure § 2961 (3d ed. 2015)).

In trademark cases, the Court must "weigh the public benefit in considering trademark principles in connection with the policy of upholding the law of contracts.'" *Beer Nuts, Inc. v. King Nut Co.*, 477 F.3d 326, 328 (6th Cir. 1973).

In support of their argument that the plaintiff abandoned its trademarks, the defendants contend that there is no evidence that the plaintiff has placed the marks on any goods sold or distributed in the United States and that the plaintiff's stated desire to resume use is insufficient to "revive" the abandoned marks. The defendants accuse the plaintiff of filing fraudulent statements with the United States Patent and Trademark Office (USPTO), attesting to its ongoing use of the two marks.

Noting that the injunction was part of the settlement, the plaintiff argues that allowing the requested modification would relieve the defendants of their end of the bargain while retaining the benefits. The injunction, it says, was intended to prevent the defendants from interfering with the plaintiff's activities in the United States, which the defendants once again seek to do.

The purpose of the injunction was to prevent the defendants from "palming off" the plaintiff's marks as their own and trading on the marks' goodwill. That is what the plaintiff bargained for in agreeing to settle the case. And that is what the defendants have done since the settlement agreement was approved. The defendants make much of the plaintiff's lack of use in commerce of the two marks in the intervening years. Under the Lanham Act, "[t]he term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "[A] mark shall be deemed to be in use in commerce . . . on goods when . . . it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and . . . the goods are sold or transported in commerce." *Ibid.* To prove abandonment, the defendants "must show (among other things) that the [plaintiff] 'discontinued' using the mark 'with intent not to resume such use,' or that the mark has become a 'generic name for the goods

or services.'" *Ausable River Trading Post, LLC v. Dovetail Sols., Inc.*, 902 F.3d 567, 571-72 (6th Cir. 2018) (quoting 15 U.S.C. § 1127).

The injunction provides the plaintiff with global protection, so the extent of use of the marks in the United States does not much matter. And in any event, the plaintiff has demonstrated a continuing interest in its marks by maintaining a website in the United States; it claims, credibly, that its website raises awareness of its brands, with an eye on reentry into the United States.

Moreover, the abandonment argument loses its force where the injunction was entered as part of a settlement agreement, not as a result of a judgment on the merits of the plaintiff's Lanham Act claims. In *Money Store, Incorporated v. Harriscorp Finance, Incorporated*, 885 F.2d 369 (7th Cir. 1989), on which the plaintiff primarily relies, the court of appeals affirmed the district court's decision to deny a request to modify an injunction where the junior user's declining use of a trademark did not justify modification. In that case the injunction was the result of a bench trial where the district court found for the defendant as a "good faith junior user of the service mark" and entered judgment and a permanent injunction preventing the plaintiff from employing the mark in the defendant's service area. *Id.* at 370. In reviewing the request for modification, the district court held an evidentiary hearing and made findings as to the defendant's continued use of the mark, asking "whether there remain[ed] any need to continue the injunction." *Id.* at 374. The district court found that the defendant's "dwindling use" of a mark or "[a] simple reduction in business activity" was not sufficiently dramatic to justify an equitable modification of an injunction where the purposes of the original litigation had not been achieved. *Id.* at 373-74.

*Money Store* is instructive here, but not for the reasons cited by the plaintiff. It does not matter whether the plaintiff has continued to use the marks or whether there was an intent to resume use, because the permanent injunction was not entered following a decision on the merits of the

infringement claim. Central to the *Money Store* court's affirmance was whether "the purposes of the original litigation" had been achieved. The purpose of the permanent injunction entered in this case was to prevent the defendants from using the CERNITIN and CERNILTON marks in the sale of their products, regardless of whether the plaintiff continued to use them and without reference to a period of time. Although that prohibition may be at odds with the principles underlying trademark law, it is what the parties agreed to, and the Court is constrained to construe the consent decree "to preserve the position for which the parties bargained." *Vanguards*, 23 F.3d at 1018.

Moreover, the defendants cannot argue credibly that a change in circumstances has made compliance too onerous or that unforeseen changes make the decree unworkable. Consider *Coca-Cola Company v. Standard Bottling Company*, 138 F.2d 788 (10th Cir. 1943), which the defendants cite in support, but which actually undermines their position. There, the Tenth Circuit affirmed the district court's decision to modify a consent decree that permanently enjoined the defendant from using the word "cola" to describe its soft drink. In finding that the district court acted within its equitable discretion in modifying the decree to allow the defendant to use the word "cola" both descriptively and in the name or trademark of any beverage it might sell, the court of appeals explained that conditions had changed "greatly" since entry of the decree. *Id.* at 790. Critically, the court noted that "[u]nder numerous decisions in many courts, it has been held that [the plaintiff] has no exclusive right to the use of the word 'cola' standing alone or to any combination including the word 'cola', except its own trademark of Coca-Cola." *Ibid.*

Neither CERNILTON nor CERNITON evoke the same product identity as "cola." This certainly is not one of those cases where the trademarks in question are so descriptive that continued enjoinment "seriously and needlessly impede[s] [the defendants'] exploitation of [a] generic term." *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 418 F.2d 31, 35 (2d Cir. 1969).

In *Coca-Cola*, the court noted that the plaintiff continued to benefit from the protection of the consent decree even though a change in law since its entry would foreclose its success on an infringement claim. That type of substantial change in circumstances is not present here.

The only plausible basis for modification would be that continued enjoinment is detrimental to the public interest because it undermines the principles on which trademark protection is based. "Trademark protection guards the public from being deceived into purchasing an infringing unwanted product." *Beer Nuts, Inc.*, 477 F.2d at 328. "It further protects the owner's investment in advertising and quality control which is often considerable." *Ibid.* (citing *Stahly, Inc. v. M. H. Jacobs Co.*, 183 F.2d 914 (7th Cir. 1950)). "The essence of the wrong of trademark infringement is the passing off of the goods of one as those of another." *Id.* at 329 (citing *Hemmeter Cigar Co. v. Congress Cigar Co.*, 118 F.2d 64 (6th Cir. 1941)).

Leaving the permanent injunction as is serves those principles. As discussed above, the defendant sold its own products to its customers in Russia, Thailand, and Australia by representing in invoices, order forms, and shipping documents that they were CERNILTON or CERNITON to match those countries' domestic marketing authorizations. The Cernelle-branded products had been approved there for distribution; the Graminex products were not. The defendants' customers likely were not deceived by that mislabeling, but the same cannot be said for the downstream purchasers whom the marketing authorizations were intended to protect. The public interest is served by an injunction that prevents these sorts of misrepresentations in which the defendants engaged.

There is no basis in equity to disturb the permanent injunction. The defendants' motion to modify it will be denied.

B. Violation of the Injunction

The Court has subject matter jurisdiction to enforce its injunction. *Shillitani v. United States,* 384 U.S. 364, 370 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt.").

The plaintiff asks the Court to hold the defendants in civil contempt for violating at least two provisions of the permanent injunction. The first prohibits May and Graminex "from pledging or alienating the trademarks in dispute, including" CERNITIN and CERNILTON. Although those words mapped out a rather narrow slice of conduct, the scope of the prohibition was modified by this explanatory language: "This injunction is intended to prevent the negotiation and execution of contracts, agreements, options to purchase, deeds, memoranda of agreements, assignments, licenses, and plans that employ or relate in any manner to the registered trademarks and trademark applications, except as required by the parties' settlement of this litigation." ECF No. 85, PageID.2036.

The second provision enjoins the defendants from "from maintaining any website that is misleading as to its relationship with the plaintiff or that mentions the products . . . CERNILTON®, . . . and CERNITIN® in any way that suggests that Graminex is involved in the manufacture, development, or ownership of the products; and selling, promoting, or advertising products manufactured by A.B. Cernelle." *Id.* PageID.2037.

A party may seek to enforce an injunction through a contempt petition. *Elec. Workers Pension Trust Fund of Local Union #58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378 (6th Cir. 2003). To succeed, "the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order." *Glover v. Johnson*, 934 F.2d 703, 707 (6th Cir. 1991). The order violated must be "definite and specific" and must require the defendants "to perform or

refrain from performing a particular act or acts." *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996) (quoting *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir. 1987)). The petitioner also must show that the defendants had "'knowledge of the court's order.'" *Ibid.* However, since civil contempt is remedial in nature, the charging party need not establish willfulness; "intent in disobeying [an] order . . . is irrelevant to the validity of the contempt finding." *In re Jaques*, 761 F.2d 302, 306 (6th Cir. 1985) (citation omitted).

"Clear and convincing evidence is a not a light burden and should not be confused with the less stringent, proof by a preponderance of the evidence." *Elec. Workers Pension Trust Fund*, 340 F.3d at 379 (citation omitted). But "[o]nce the movant establishes his prima facie case, the burden shifts to the contemnor who may defend by coming forward with evidence showing that he is presently unable to comply with the court's order." *Ibid.* (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)). "To meet this production burden in this circuit 'a defendant must show categorically and in detail why he or she is unable to comply with the court's order.'" *Ibid.* (quoting *Rolex Watch U.S.A., Inc.*, 74 F.3d at 720.

Based on the conduct discussed above, the plaintiff has met its burden of showing that the defendants violated the first provision of the permanent injunction. The defendants plainly knew of the injunction. And although the defendants did not "pledge" or "alienate" the plaintiff's trademarks, their sales of their product using CERNITIN and CERNILTON on the order forms, invoices, and shipping documents to Graminex Pharma, Graminex Thailand, and Graminex Australia involved "the negotiation and execution of contracts [and] agreements . . . that employ or relate . . . to the [plaintiff's] registered trademarks."

The defendants maintain that none of the evidence presented at the hearing showed that the defendants "pledged" or "alienated" any of the plaintiff's marks, emphasizing a literal definition

of those terms and arguing that at the time the injunction was entered, the Court's concern "was only the transfer or alienation of the marks during the pendency of the litigation." But that strained reading of paragraph 1 of the permanent injunction ignores the express language outlining the conduct that the injunction was intended to prevent: negotiating and making contracts "in any manner" that "employ[ed] . . . the [plaintiff's] registered trademarks."

It has been said that "a defendant that 'hew[s] to the narrow letter of the injunction while simultaneously ignoring its spirit' charts such a course at its peril." *CFE Racing Prod., Inc. v. BMF Wheels, Inc.*, No. 11-13744, 2015 WL 13022178, at *5 (E.D. Mich. Feb. 20, 2015) (quoting *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014)). If the defendants had any doubt about the scope of the injunction, they should have sought clarification from the Court *before* they acted. "The defendants acted at their own risk by failing to seek the court's interpretation of the injunction if they had any good faith doubt as to its meaning." *Polo Fashions, Inc. v. Stock Buyers Int'l, Inc.*, 760 F.2d 698 (6th Cir. 1985).

The testimony at the hearing established that the defendants used the plaintiff's marks in order to circumvent import restrictions in Russia, Thailand, and Australia. The defendants plainly violated paragraph 1 of the permanent injunction in doing so.

As to paragraph 3, the plaintiff failed to establish that the defendant somehow manipulated internet search results when a search is performed for "cernilton" or "cernitin." The most that was shown was that including the clinical studies of CERNILTON and CERITIN on the Graminex website may have checked one of the boxes in Google's search algorithm. But the plaintiff's own web design expert acknowledged that Google uses "thousands" of factors to prioritize and order search results, and he could not point to any conduct by the defendants intended to cause confusion in the search results.

The defendants do not address whether placing Graminex's logo on the clinical studies amounts to a violation of the injunction. Even though the plaintiff could not show conclusively that the clinical trials affected Google search results, merely posting clinical studies on the plaintiff's products with Graminex's logo affixed to the article certainly qualifies as "maintaining any website that is misleading as to its relationship with the plaintiff or that mentions the products . . . CERNILTON® . . . and CERNITIN® in any way that suggests that the defendants are involved in the manufacture, development, or ownership of the products and selling, promoting, or advertising products manufactured by the plaintiff." Those studies are displayed on Graminex's website with its beaker logo prominently affixed to each page. The injunction was not meant to prevent comparison advertising. *See* Settlement Agreement, § A(5), ECF No. 89-2, PageID.2101. But those studies do not compare the plaintiff's and defendants' products. Instead, they extol the virtues of CERNILTON and CERNITIN as agents that promote prostate health. The beaker logo embossment plainly suggests that those products are affiliated with Graminex.

The plaintiff has shown clearly and convincingly that the defendants were aware of the injunction and violated it. They will be found in civil contempt of the Court's permanent injunction entered September 29, 2006.

## IV. Laches

The defendants urge the Court to dismiss the enforcement motion because, they say, the plaintiff is guilty of laches. "'Laches is the negligent and unintentional failure to protect one's rights.'" *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 584 (6th Cir. 2015) (quoting *Nartron Corp v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002)). Ordinarily, a party asserting laches must show "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Ibid.* The settlement agreement

and the injunction it incorporates were made to settle a lawsuit brought in Michigan (albeit in a federal court) and therefore are governed by Michigan law. *See Nur v. Stewart*, No. 19-10102, 2019 WL 3958366, at *2 (E.D. Mich. Aug. 22, 2019).

The defendants maintain that Cernelle knew about the defendants' violations of the injunction and settlement agreement as early as 2006. It was aware that Graminex posted the CERNNILTON and CERNITIN clinical studies on its website back then. Cernelle knew that Graminex Australia was using the name "Cernilton" in 2003, and in 2008 it received a "watch notice" report that an entity named "Gramineks Pharma" had applied for a registration for "Tsernilton" in Russia. And the defendants point out that Goran Hellstrom testified that Cernelle's CEO received regular reports from its intellectual property firm regarding use of Cernelle's marks around the world; that Cernelle knew of several years of usage of CERNILTON in Russia, Thailand and Australia; and that Cernelle suspected Graminex's involvement, but Cernelle lacked the "financial muscles" to raise the issue with Graminex. Cernelle did not file its motion to enforce the settlement agreement and hold the defendants in contempt until August 24, 2018.

"In the Sixth Circuit, there is a strong presumption that any delay by the plaintiff is reasonable provided the applicable state statute of limitations has not lapsed." *Ford Motor Co. v. Powerflow, Inc.*, No. 86-74100, 2006 WL 2193802, at *7 (E.D. Mich. Aug. 2, 2006) (citing *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 320 (6th Cir. 2001)). On the other hand, it is "'presume[d]' that an action is barred if not brought within the period of the statute of limitations . . . ." *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985) (citations omitted).

More recently, Michigan courts have modified that latter presumption, observing that "[t]he application of laches can shorten, but never lengthen, the analogous period of

limitations. . . . Thus, laches may bar a legal claim even if the statutory period of limitations has not yet expired." *Tenneco Inc. v. Amerisure Mutual Insurance Co.*, 281 Mich. App. 429, 761 N.W.2d 846, 864 (2008); *see also Dept. of Envir. Quality v. Gomez*, 318 Mich. App. 1, 29, 896 N.W.2d 39, 54 (2016) ("[C]ourts may apply the doctrine of laches to bar actions at law even when the period of limitations established by the Legislature has not expired."); *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 912 F.3d 316, 342-43 (6th Cir. 2018).

The defendants urge the Court to apply the statute of limitations for trademark law to trigger the presumption, which under Michigan law would be three years. *See Powerflow, Inc.*, 2006 WL 2193802, at *7. However, "[a] settlement agreement is a type of contract," *Allstate Ins. Co. v. Tox Testing, Inc.*, No. 18-13336, 2019 WL 5387935, at *4 (E.D. Mich. Oct. 22, 2019) (citing *Universal Settlements Int'l, Inc. v. Nat'l Viatical, Inc.*, 568 F. App'x 398, 401 n.2 (6th Cir. 2014), and the statute of limitations for breach of contract actions is six years, Mich. Comp. Laws § 600.5807(9).

Based on the testimony of its financial witness, it appears that the plaintiff is not seeking remedies for breach of the settlement agreement or violation of the injunction earlier than the summer of 2012, that is, six years before it filed its motion. Neither Michael Chase nor Rodney Crawford analyzed any accused sales beyond a six-year lookback period. And in the Sixth Circuit, laches does not foreclose a plaintiff's right to injunctive relief and post-filing damages. *Nartron Corp.,* 305 F.3d at 412 (citing *Kellogg Co. v. Exxon Corp.* 209 F.3d 562, 568 (6th Cir. 2000)). The hard presumption wrought by the statute of limitations is not triggered here.

But because that statute of limitations is not the only measure, *Innovation Ventures*, 912 F.3d at 342-43, the plaintiff is required to "(1) rebut [any] presumption of prejudice; (2) establish that there was a good excuse for its delay; or (3) show that the defendant engaged in particularly

egregious conduct which would change the equities significantly in plaintiff's favor." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 409 (6th Cir. 2002) (quotation marks and citations omitted).

The defendants say that they suffered prejudice through loss of documentary evidence (emails before 2016), loss of a key witnesses (death of Cernelle's CEO from 2002 through 2015) who knew about the alleged violations but did nothing about them, and Graminex's continued expansion of its business, including major capital purchases in 2015 (the tableting machine). The evidence that the defendants say they lost would have served only to establish the plaintiff's delay in filing the instant motion, not whether the defendants' conduct constituted violations of the settlement agreement or permanent injunction. Finding the plaintiff guilty of laches because its delay caused a loss of evidence that might have shown it is guilty of laches is an infinite loop of circular reasoning that does little to show how any delay interfered with the defendants' capacity to defend against the merits of the motion. *See United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 260 (2002) (Souter, J., dissenting) ("Reasoning this circular may warrant suspicion.").

The defendants' better-reasoned argument is that the plaintiff's delay filing the enforcement motion affected its capital outlay for the tableting machine in 2015. That machine currently is dedicated to producing the flower pollen pills that Graminex ships to Russia. However, Heather May acknowledged that the machine could be used for other purposes with some tooling modifications. This evidence tends to rebut the presumption of prejudice.

The plaintiff has not offered a good explanation for its lack of diligence. It concedes that in 2007 it learned of Graminex Pharma's application to register CERNILTON as a trademark in Russia. But Cernelle argues that it did not know nor could it have known at the time that Graminex played a role in the registration process or that Graminex had formed an ongoing distribution

relationship with Graminex Pharma. Cernelle also held out little hope of successfully challenging that registration in a legal proceeding in Russia against Russian nationals. Cernelle also does not dispute that it knew about Graminex's website content for years but chose not to pursue contempt until late 2016 when new management sought to investigate possible violations more thoroughly and it was in a better financial position to fight back. The plaintiff's "lack of financial muscle" before 2017 is not a valid excuse for its lack of diligence. *See MGA, Inc. v. Centri-Spray Corp.*, 639 F. Supp. 1238, 1242 (E.D. Mich. 1986). Nor is a strategic decision to delay instituting litigation based on a lack of resources good cause.

However, the evidence demonstrates that the defendants' conduct is "particularly egregious." For several years after the defendants signed the settlement agreement, they used the plaintiff's trademarks to sell product to foreign distributors. And the reason they did so was to help those customers avoid the requirements of domestic market registration laws in the export countries. Years before, Cernelle had obtained authorizations in those markets by submitting the product information of CERNILTON and CERNITIN to the proper agencies in Russia, Thailand, and Australia and won approval to market its product there. Graminex later sold its own product, which it acknowledged was formulated differently, masquerading as Cernelle-branded products in invoices and order documents so that it could be imported as if it were Cernelle's approved nutraceuticals. It is not too great a step to say that the defendants conspired with their distributors to defraud the importation authorities in those three countries. And "particularly egregious" is an apt label for that conduct. Accepting a laches defense in the wake of that conduct would reward the defendants solely because they didn't get caught sooner. That is not acceptable. *See Marshak v. Treadwell*, 595 F.3d 478, 498 (3d Cir. 2009) ("Treadwell did not consent to the present infringement — to the contrary, she has approached us seeking to enforce a[n] injunction that she

had previously pursued and been granted. The long and tortured history of this case attests to the fact that Treadwell has not acquiesced to Marshak's activities. Given the progress of this case, Appellants cannot argue that they relied on some right to violate the injunction, nor that they were prejudiced for being permitted to violate the injunction longer than expected.").

Put another way, laches is an equitable defense. To assert it, the defendants must have "clean hands." "The unclean hands doctrine derives from the equitable maxim that 'he who comes into equity must come with clean hands.'" *Cleveland Newspaper Guild, Local 1 v. Plain Dealer Pub. Co.*, 839 F.2d 1147, 1155 (6th Cir. 1988). "This maxim 'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior' of the opposing party." *Ibid.* (quoting *Precision Inst. Mfg. Co. v. Auto. Maintenance Mach. Co.*, 324 U.S. 806 (1945)). Michigan law will not allow the defendants here to rely on a laches defense to avoid the command of the permanent injunction or the equitable enforcement of the settlement agreement. *Attorney General v. PowerPick Players' Club of Mich., LLC*, 287 Mich. App. 13, 52, 783 N.W.2d 515 (2010) (stating that one with unclean hands may not assert the equitable defense of laches).

## V.  Remedies

The plaintiff has asked the Court to award the following relief: (1) enter additional injunctive orders preventing the defendants from dealing with foreign distributors who use the plaintiff's trademarks to import, package, or sell product supplied by Graminex U.S.; (2) order Graminex to remove from its website any reference to Cernelle-branded products; (3) impose monetary contempt sanctions to coerce future compliance with the injunction; (4) order Graminex to disgorge its profits from the sale of its product to Graminex Pharma, Graminex Australia, and Graminex Thailand; (5) award the plaintiff its attorney's fees and costs. All of these forms of

relief are authorized for addressing contumacious conduct and settlement agreement breaches, and each is appropriate to some extent in this case.

### A. Remedial Injunctions

"[I]t is well-settled that 'courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them.'" *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting *Sarabia v. Toledo Police Patrolman's Ass'n*, 601 F.2d 914, 917 (6th Cir. 1979)). That power has been characterized as "broad." *United States v. Bd. of Cty. Commissioners of Hamilton Cty., Ohio*, 937 F.3d 679, 688 (6th Cir. 2019) (quoting *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 861 (9th Cir. 1992)). The Court's authority to issue and enforce injunctions "springs from the court's inherent equitable powers." *Innovation Ventures, LLC v. N2G Distrib., Inc.,* 763 F.3d 524, 544 (6th Cir. 2014). And the Court is "vest[ed] . . . with inherent authority to enforce its orders by granting injunctive relief." *Frazier v. Malek*, 591 F. App'x 468, 469–70 (6th Cir. 2015) (citing *S.E.C. v. Dollar Gen. Corp.,* 378 F. App'x 511, 516 (6th Cir. 2010).

One main purpose of the settlement agreement was to convey to the plaintiff all interest that the defendants might have had in the plaintiff's trademarks. The permanent injunction followed form and was "intended to prevent the negotiation and execution of contracts, agreements, options to purchase, deeds, memoranda of agreements, assignments, licenses, and plans that employ or relate in any manner to the registered trademarks and trademark applications, except as required by the parties' settlement of this litigation." ECF No. 85, PageID.2036. That language plainly applied to a "plan" by the defendants to sell to foreign customers Graminex products misidentified on packing and sales documents as Cernelle-branded products. Those products, in turn, were packaged and sold by the foreign distributors using the CERNILTON and

CERNITIN marks. And the defendants continued selling their own product to those customers after they learned of that conduct. The defendants are in contempt for violating the injunction, although they maintain that they were justified in shipping Graminex products because their customers told them to do it. That response suggests that the injunction, although plain on its face, requires clarification. Therefore, the Court will further enjoin the defendants from selling any product if the sales of shipping paperwork uses any of the marks identified in the permanent injunction. The defendants also will be prohibited from selling product to any customer or distributor that uses any of those marks in marketing or packaging the product.

The injunction also prohibited the defendants from posting certain content on their website that suggests that they were involved in any way with the plaintiff or the plaintiff's branded products. The plaintiff points to certain reports of clinical trials containing the plaintiff's marks posted on the Graminex website as contumacious conduct. The plaintiff failed to establish that the defendant somehow manipulated search results displayed by Google when a search for CERNILTON or CERNITIN is performed. The defendants argue that nothing in the permanent injunction prohibits the defendant from posting clinical trials and that the plaintiff has known for a number of years that the articles were on the website. But the defendants do not address whether placing Graminex's beaker logo on those studies amounts to a violation of the injunction. Affixing that logo to each page of the clinical studies associates Graminex with the plaintiff's products. Even though the plaintiff could not show conclusively that the presence on the defendant's web page of the clinical trials affected Google search results, merely posting clinical studies on the plaintiff's products with Graminex's logo affixed to the article certainly qualifies as "maintaining any website that is misleading as to its relationship with the plaintiff or that mentions the products . . . CERNILTON . . . and CERNITIN in any way that suggests that the defendants are involved in

the manufacture, development, or ownership of the products and selling, promoting, or advertising products manufactured by the plaintiff." The defendants will not be required to remove comparison studies, but they must remove the studies displaying the beaker logo, which mention the plaintiff's branded products.

### B. Monetary Sanctions and Disgorgement

Disgorgement of profits is a traditional remedy in a trademark infringement case. *Balance Dynamics Corp. v. Schmitt Industries, Inc.*, 204 F.3d 683, 695 (6th Cir. 2000). And that remedy perforce is available when the infringing conduct violates an injunction. *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 457 (1932) ("[I]t has been repeatedly assumed that, in a proceeding for civil contempt for disobedience to an injunction granted in an infringement suit, the profits derived from the violation of the injunction are recoverable."). When imposed in a trademark action in the first instance, the remedy is intended to compensate, not to punish. *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 487 F. Supp. 2d 861, 891 (E.D. Ky. 2007) ("Profit disgorgement is an equitable remedy available under the Lanham Act, and it cannot be used as a penalty.") (citing *Balance Dynamics Corp.,* 204 F.3d at 695). In the context of a contempt proceeding, however, the disgorgement remedy takes on a slightly different hue. That is because civil contempt sanctions serve the twin purposes of compensating for a loss caused by the contumacious conduct and also "coerc[ing] future compliance with a court's order." *Gnesys, Inc. v. Greene*, 437 F.3d 482, 493 (6th Cir. 2005) (quoting *Glover v. Johnson*, 199 F.3d 310, 313 (6th Cir. 1999)).

When ordering disgorgement of profits as a remedy for violating an injunction in a trademark case, "the [] use of profits as a measure for the contempt sanction is hardly a novel proposition." *Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1004 (9th Cir. 2004)

(citing *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 (9th Cir. 1985)). "[W]ilfulness is not an element of civil contempt, but the state of mind of the contemnor is relevant [] in the consideration of sanctions." *Gnesys*, 437 F.3d at 493 (citing *Rogers v. Webster*, 776 F.2d 607, 612 (6th Cir. 1985)). It has been observed that "[d]isgorgement is an equitable remedy to force a defendant to give up the amount equal to the defendant's unjust enrichment," *Gavriles*, 194 F. Supp. 2d at 681, not necessarily "to compensate the victims," *Blavin*, 760 F.2d at 713 (citing *S.E.C. v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978)); *see also Tom James Co. v. Morgan*, 141 F. App'x 894, 899 (11th Cir. 2005) ("To the extent that the district court did not think that the disgorgement of Morgan's profits was within its power to award as a civil contempt sanction, the district court erred."); *ePlus Inc. v. Lawson Software, Inc.*, 946 F.Supp.2d 449, 455-59 (E.D. Va. 2016) (holding that disgorgement of profits and revenues earned was not an impermissibly punitive measure of damages if the competitor were found in civil contempt for violating permanent injunction relating to patents).

The defendants argue that their sales to the entities in Russia, Thailand, and Australia, lawful or not, did not cause any loss to the plaintiff because Cernelle had no market presence in those countries at the time and therefore could not have "lost" any sales. If compensation were the only goal of disgorgement, that might be a valid defense. But, as noted above, disgorgement is an equitable remedy, which, in the contempt context, is intended to coerce future compliance with the Court's orders and neutralize the benefit of a contemnor's unjust enrichment.

In fashioning an equitable remedy, there are a number of factors that the Court considers. One is that the defendants' conduct was willful. They acted with full knowledge of the injunction's restrictions, yielding, they say, to the customers' demands to identify their product with the plaintiff's trademarks. In addition, because of the requirements of the market authorizations for

the foreign transactions, the sales could not have occurred without the offending conduct, that is, the use of the marks that the injunction barred the defendants from using "in any manner."  Absent the offending conduct, there would have been no sales and no profit.  Balanced against those factors is the absence of any actual lost sales by the plaintiff, and the defendants' capital outlay for its tablet machine.

The plaintiff asks for disgorgement of profits going back six years.  But because Cernelle did not attempt to enter (or re-enter) the markets in those countries, it is appropriate to consider its delay in asserting its rights.  As the defendants note, borrowing the six-year limitations period governing breach of contract claims effectively would reward the plaintiff for delaying the proceedings and create a perverse incentive for delay where Cernelle has no anticipated market presence in the targeted countries.  The appropriate lookback period, therefore, is three years from the date Cernelle sent its cease-and-desist letter to Graminex.

The economic witnesses agreed that the measure of profit is sales revenue minus net costs.  Because Graminex did not track costs of sales on a product-by-product basis, Michael Chase's incremental-product approach was the more appropriate method for determining net costs.  Rodney Crawford's fully-costed approach was not better suited because it tended to confound fixed costs in the calculations that had little to do with the accused sales.  Moreover, Chase's "simplifying assumptions" to determine a rough adjustment of each cost category were reasonable, as was his decision not to include research and development costs, some legal and professional costs, and freight, rent, and depreciation.  Likewise, Chase's decision not to include interest expenses was reasonable, as it was not an operating cost but instead was a financing choice.  That was consistent with his full deductions for equipment leases and the deduction of depreciation of the equipment at a rate of about 40%.

Using a three-year lookback period, the profits Graminex must disgorge is $535,854.

### C.  Attorney's Fees

Finally, "[t]he award of attorney's fees and expenses to a successful movant may be appropriate in a civil contempt proceeding." *TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir. 1983) (citing *Chas. Pfizer & Co. v. Davis-Edwards Pharmacal Corp.,* 385 F.2d 533, 538 (2d Cir. 1967)).  "The Court can . . . award . . . attorney[']s fees for a defendant's violation of permanent injunction."  *Cricket Commc'ns, Inc. v. Mojo Mobile, LLC*, No. 13-0214, 2014 WL 37231, at *2 (M.D. Tenn. Jan. 6, 2014) (citing *Gnesys, Inc. v. Greene,* 437 F.3d 482 (6th 2005)); *see also Chere Amie, Inc. v. Windstar Apparel Corp.*, 175 F. Supp. 2d 562, 567 (S.D.N.Y. 2001) (stating that an award of reasonable attorney's fees is proper when the contemnor (1) had actual notice of the order; (2) was able to comply with it; (3) did not seek to have it modified; and (4) did not make a good faith effort to comply).

In this case, Cynthia May and Graminex were well aware of the permanent injunction and its restrictions and requirements, there is no apparent reason why they could not abide by its terms, and they never sought guidance from the Court about its meaning, nor did they seek to have the injunction modified before these enforcement proceedings began.  They made no good-faith effort to comply with the injunction; instead, they willfully violated it.  The plaintiff, therefore, may seek an award of expenses and attorney's fees by filing a properly-documented motion under Federal Rule of Civil Procedure 54(d).

### VI.  Conclusion

The hearing evidence establishes that the defendants breached the settlement agreement and violated the permanent injunction.  There is no basis to modify the injunction.  The plaintiff is

not guilty of laches. And the appropriate remedy includes further injunctive orders, disgorgement of profits, and attorney's fees and expenses of litigation.

Accordingly, it is **ORDERED** that the plaintiff's motion to enforce the settlement agreement and to hold the defendants in contempt (ECF No. 89) is **GRANTED**.

It is further **ORDERED** that the defendants' motion to modify the injunction (ECF No. 116) is **DENIED**.

It is further **ORDERED** that defendants Cynthia May, Graminex, L.L.C., their agents, servants, attorneys, employees, and all those in active concert and participation with them who receive actual notice of this order, are **RESTRAINED AND ENJOINED** from (A) selling any product that is identified in any manner using any of the trademarks listed in the permanent injunction entered in this case (ECF No. 85), including CERNILTON and CERNITIN; and (B) selling, transferring or conveying in any manner any product to a customer that the enjoined parties know or should know uses in any way any of the trademarks listed in the permanent injunction entered in this case (ECF No. 85), including CERNILTON and CERNITIN.

It is further **ORDERED** that defendants Cynthia May, Graminex, L.L.C., their agents, servants, attorneys, employees, and all those in active concert and participation with them who receive actual notice of this order, must immediately remove from their websites reports of clinical trials and all other documents that bear the Graminex beaker logo and mention CERNILTON or CERNITON.

It is further **ORDERED** that defendants Cynthia May and Graminex, L.L.C. forthwith must disgorge and pay over to the plaintiff profits from offending sales in the amount of $535,854.

It is further **ORDERED** that the plaintiff may recover its costs, expenses, and attorney's fees incurred in prosecuting this motion to enforce the settlement agreement and to hold the

defendants in contempt, provided that it files an appropriate motion under Federal Rule of Civil Procedure 54(d) **on or before February 18, 2020**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   February 4, 2020

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on February 4, 2020.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI